Thank you. Good morning, everyone. I'd like to first recognize a member of our panel, U.S. District Judge Lewis Pollack, who is a distinguished jurist in the Eastern District of Pennsylvania and helps us on many, many occasions. We are delighted and happy to have him sit with us today. Thank you, Judge. I'm delighted to be here. Okay, let's call the first case, United States v. Orocio. Mr. Alcorn, good morning. Good morning, Your Honors. May it please the Court, my name is John Alcorn and I'm I'll use as much time during the 15 minutes as the Court has, either for oral argument directly by me or for questions, so it'll be up to the Court, and then I'll rest my case when we're finished. I believe this case rests on how this court sees the I wonder if you could either speak louder or perhaps lower the volume. Yes, Your Honor. I think in large part this case might rest on how this court sees the U.S. Supreme Court case of Padilla, which was decided this past March 31st, 2010. Now the District Court, in the underlying decision, which was decided in January, I believe January 4th, 2010, did not have the benefit of the Padilla decision, which came two and a half months later. The standard of review issue is not as exciting as the other issues in the case, but do you want to touch on it briefly? Sure, Your Honor. What is the appropriate standard of review when reviewing a denial of a motion for quorum nobis relief? I believe that it's a de novo standard of review, and that I believe that that applies to questions of law as to questions of fact. If this court finds any egregious disregard by the District Court, I believe that you could look into that. I believe that's a correct standard of review. It's similar to what is currently in other circuits, specifically the Second and the Ninth, and it's a very limited standard of review. Okay. You may get no disagreement on that from Mr. Gross. Let's go ahead. Yes, Your Honor. In any event, the two major cases that seem to me bearing directly on this particular appeal are Padilla and the Strickland case, which was written, I believe, the majority decision by Justice O'Connor. And whether or not my client received prejudice is bearing directly on this point, because if he wasn't prejudiced by the conduct of his counsel in disregarding the mandatory deportation consequences of his guilty plea, if he wasn't prejudiced, I believe he was. But what was the prejudice, though? In fact, he was looking at a sentence of 10 years in prison. He was given a six-month time served sentence in exchange for his plea. Is it realistic to believe that he would have rejected the plea and gone to trial facing a 10-year sentence? It's hard to imagine a better deal. I totally agree with the Court. He got a wonderful deal from the U.S. Attorney's Office. He truly did. The only thing that would have been a little bit better is if they could have pled him in line with the federal first offender statute, which would have prevented his deportation. Did he qualify for first offender treatment? I believe he did. Given his past brushes? I believe he did. He's not an admirable person. I'm not sticking up for him. But his past conduct was under state law. And the record, as far as I'm aware, is a little bit murky as to whether those were actual convictions. He's not an admirable person. But all that I would have argued in hindsight, which his defense counsel didn't have the benefit of my hindsight today, I'll totally admit, is to place him under the Federal First Offenders Act. Because he is in deportation proceedings in Los Angeles. With his criminal conviction, the immigration judge must and will deport him. I am representing him in that matter, too. I've gotten an extended continuance from the immigration judge for the purpose of this court to render a decision on the Coram Nobis motion. She was very gracious to do that. I'm not even saying— Yes, sir. Let me interrupt you. You've acknowledged that it was a pretty generous deal—  —was offered to and accepted by Mr. Orocio. Is there anything in the record that tells us, that explains that? Not that I found, Your Honor. And I agree, it was a wonderful deal. And his brother got the same deal. And his brother, also from the Philippines, has not been put into deportation proceedings, just through the course of fate. But it was a great deal. And no explanation at all as to—anywhere in the record as to— I tried to contact, on many occasions, private defense counsel in the district court case. To no avail. That person didn't respond to me. So I just don't know. Well, that brings up another point. You know, Ed, I guess when the plea was taken in at sentencing, something about the possibility—you know the specifics, but it was mentioned. Didn't that put your client on notice that, hey, maybe something—we ought to look into this? The district court judge did mention the possibility of collateral immigration consequences at the sentencing. Yes, Your Honor. Well, yeah, okay. Yeah, he was pretty specific, you know, I thought. But he didn't say— It wasn't a warning that—well, go ahead. With all due respect to the district court judge, he's a senior judge. I've read the transcripts of the proceeding. He did a great job, but he didn't say that deportation is mandatory and will ensue. And that was the law even five years ago, Your Honor. Six years ago. Well, let me ask you. You mentioned about your contacts with the defense counsel. Our record only contains your client's statement that he never said anything. Wouldn't your best-case scenario only be that we return it for hearing to see whether actually anything was said? Well, my best-case scenario is pretty unrealistic, and that's for this court to grant the writ of ericorum nobis. So I guess my second best-case scenario would be to return it to the district court in New Jersey for a hearing. On that issue, right? On that issue. I still find the—on the issue of prejudice, maybe you can elaborate a little bit why a defendant would fear, I guess, removal, having to go back to his prior country, and instead take his chances with a 10-year prison sentence, or let's say he would get a shorter prison sentence, and then be removed anyway. Well, that's pretty fact-specific. I have clients from many countries all over the world, and the Philippines has a pretty nice climate, and it's not as terrible in terms of its government as other countries, so it's hard to generalize on that. Some clients from some countries would probably take their risk. I have already admitted this client— I thought you would talk about the substantial roots that he has in the United States. Well, he does have roots here, and his lawful permanent resident girlfriend of many years won't marry him until she finds out whether he's going to be deported or not, and he's got family members here. I thought true love conquered all. Well, I'll defer to the court. Maybe that's true, Your Honor. In any event, he does have contacts here. He's rooted here. He's been here for 14 years or so, but I can't argue that he would suffer horrific things by being deported to Manila. The only chance that you have, really, as I see it, is that pretrial intervention program, which would result in an expungement of his conviction. Right. Okay, but the strength of your case rises and falls on our accepting that Padilla covers your case. Totally, and opposing counsel has written eloquently that Padilla should not be found to have retroactive effect. If we agree with counsel, you lose the case. Yeah, I totally agree with that. Why does Padilla have retroactive effect? Because I don't think it articulates a new standard about effective assistance of counsel in as much as it applies a preexisting standard, and I think Justice Stevens even said that in the Padilla decision. Mr. Alcorn, in your brief, you say Padilla merely applies the Strickland test for ineffective assistance of counsel to a new situation. That's what I believe, Your Honor. Doesn't that put rather heavy emphasis on the adverb merely? Yes, it does. Merely? I agree with you. Can I quote one sentence from Justice Stevens? In the light of Teague and Lane, isn't that quite an obstacle? It is. It is. Don't get around it. Well, Justice Stevens said, for at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea. I think that's very, very significant. Is there anything in Rule 11 concerning the taking of pleas in federal court that might give us some guidance as to whether Padilla is retroactive or not? In other words, does Rule 11 tell counsel this is what you have to do? I don't think so, but I don't remember the details of Rule 11. Does counsel have a responsibility to tell his or her client of the nature and consequences, all the nature and consequences of a plea before the plea is offered? As a general proposition, yes, Your Honor. As a general proposition, an alien who is about to be deported would be concerned about that before entering a plea? I should think so. I know so, from so many of my clients. I'm feeding you too many answers, but I'm wondering whether the nature of the hearing itself dictates to counsel what counsel should do before offering a plea for assignment. If the trial court, district court, defense counsel had told the appellant in this case, you will be deported as a result of this. Sooner or later, Immigration and Customs Enforcement is going to get you. Here's my point. The Supreme Court said that, but I'm wondering if it was just restating something that was already out there. In other words, this is a professional responsibility that the Supreme Court merely restated. That's the way I read the Padilla decision. And restated it in the context of pleas and immigrants who are about to be deported. Well, I agree with that, and perhaps I used the word merely, inappropriately in my brief, but I do believe it's a statement, the Padilla decision is a statement of existing principles and good law, not a new Supreme Court decision that can only be applied prospectively. What would you do if a defendant says to his lawyer, look, I've got a problem here, I don't want you to say anything to the court because I don't want the court to know of my current status. What would happen there? You might say that's not our case, but I'm... But I've never heard of an alien defendant hiding that fact from a state or federal trial court. I guess it could be the case. In my 36 years of practicing immigration law, I just haven't come across that. Mr. Alcorn, as I understand Judge Wall's opinion, he didn't address the Padilla issue. He simply found that there was no prejudice. Now, central to that determination by the judge, as I understand it, was the judge's statement. Mr. Arruccio has not disputed the accuracy of the underlying facts giving rise to his guilty plea because Mr. Arruccio has admitted in open court that he was guilty of the crime of which he was convicted, does not now challenge his guilt. The Strickland test is not satisfied. Does that foreclose the prejudice issue that he's admitted in open court that he's guilty? According to Judge Wall, who was also the trial court judge at sentencing, yes. According to Justice Stevens, no. Padilla, the person from Kentucky, had pled guilty, and Padilla was actually physically deported because of his second guilty plea. So in Padilla's case, the fact that he had pled guilty and admitted his court didn't prevent the Supreme Court from ruling in his favor. But to prove prejudice, don't you have to at least show some sort of reasonable probability that had your client not pleaded guilty that it would prevail the trial? That was the test, the way Strickland was interpreted, both by Judge Wall, and I think quite credibly and articulately, and by many other courts. Are you arguing that your guy's not guilty? No way. He is guilty, Eric. He is guilty. I thought your argument is that the plea itself is not knowing. Plea because I didn't know that if I pled guilty that I would be sent back to whatever, I can't remember the country. So he wants to vacate his plea. Right. But you say he's guilty. I thought your argument was I want to vacate my plea and I'll take my chances in trial, or I'll try to work out a better deal, or I'll make an application for first offender status. That's what I hope to do. If this writ is granted by this court, then I, especially if it's remanded for a hearing, I hope to negotiate with the U.S. Attorney's Office in Newark, New Jersey. So ultimately your argument is that this was a plea that was entered in court, but it was not a knowing and voluntary plea. That's the exact essence of my argument, Your Honor. Okay. The red light is on. Thank you very much. Thank you, sir. Thank you all. Thank you. Mr. Gross. Mr. Occohan, you didn't take rebuttal time, did you? Correct. Okay. Thank you. Good morning. Mr. Gross. Good morning. May it please the Court, Norman Gross on behalf of the United States. There are, I think, two, we've raised several reasons why this court should affirm Judge Walz without a remand for an evidentiary hearing to get into proof on the prejudice issue. And Mr. Alcorn's candid concession this morning that his client is guilty of a crime for which he must be deported precludes quorum nobis relief. And that's because quorum nobis is limited to the most fundamental errors. And that is why we made the point in our letter brief that we submitted a couple weeks ago that there is an element of discretion, that this Court has discretion, this Court reviews the ultimate decision about the denial of a petition for rid of quorum nobis on an abuse of discretion. Mr. Gross, if Padilla applies to this case, would there not be a fundamental error inasmuch as the Supreme Court says in every instance where an alien may be deported, it is the responsibility of counsel to inform the alien of that fact. And that didn't happen in this case. Respectfully, no, it would not be a fundamental error, Your Honor. A fundamental error is... I'm sorry, but the Supreme Court said that's a violation of Strickland. You have to do that. That's right, Your Honor. If Padilla says that counsel now has a Sixth Amendment obligation to warn or advise his or her clients about possibilities of deportation, the fact that it's a constitutional right, I think, does not make it a fundamental error with respect to quorum nobis. Quorum nobis is the last refuge for a person challenging their conviction and sentence on collateral review. They've already... I thought the government's position was that this issue could have been raised on habeas if Mr. Arrocchio had moved in time, but it was the delay and, therefore, the refuge in quorum nobis that the government found to be procedurally a bar. There are two reasons I submit, Your Honor, why quorum nobis is not appropriate here. One is that Mr. Arrocchio could have filed a 2255 motion in this case because when he was sentenced in March of 2005, Judge Walz told him, you may be deported. Mr. Gross, I noticed in your brief you used a phrase which struck me as interesting. He had declined to complain earlier about the plea counsel's conduct, but that was why he was now at quorum nobis rather than habeas. You say he had declined. You're suggesting that there was a point at which he had a choice to make and that he did choose to wait? Your Honor, I don't... The record wouldn't show that. I'm not saying he made a voluntary intelligent waiver of his right to file a 2255. What he was told by Judge Walz, that he was at risk of deportation. Oh, wait a minute. He was at risk of deportation? Yes. I don't remember that. Well, Judge Walz said to him, if you are deported, you have to consult with immigration nationality. You can't come back into the country. Did he use that phrase also, if you are deported? Yes, he did. And he wouldn't be speaking about deportation, Your Honor, unless of course... He said you have to cooperate with immigration. That's right. And he said you should cooperate with immigration and INS. Wasn't the admonition that if you were deported, you can't come back into this country without permission? That's right, Your Honor, but why would Judge Walz... And that was advice that he was to be deported? No, that was a statement that there was a risk he would be deported. And Padilla talks about the different kind of consultation the counsel must make with a non-citizen client. It said if it is clear under the law that there's absolute deportation without any right of relief, then counsel must give that advice. Do you think that was sufficient to trigger some sort of pleading or filing by the defendant? I think that put the defendant on notice, at least, that he could have... He ultimately went and found an immigration specialist. After he got a notice. That's right. But our position is that... Upon hearing it in district court, he should have done something? Yes, that he should have gone to the immigration specialist at that point. Would you have satisfied Strickland if counsel had said to Mr. Orochio, if you're deported, you have to... You can't come back into the country without permission. Would that have been a sufficient warning that a guilty plea was going to create a mandatory detention and looking toward removal? Would that have been satisfactory? I'm sorry. Is your question, would a statement by counsel that you are going to be deported... No, not that you're going to be deported. If counsel had simply advised his client in the very same language that Judge Walls used, would that be sufficient under Strickland? Would that be sufficient advice? I think it might, Your Honor. Padilla is the case that talks about the requirement for giving advice under consultation. It says, if you look at the statute and you're convicted of an aggravated felony, which, of course, Mr. Orochio was not convicted of, then counsel has to say, you will be deported. He has to give that warning. The court went on to say, however, and Judge Alito, Justice Alito expounded on the difficulties and the complexities of immigration law, that there are many circumstances where deportation is not clear. Now, the reason why Mr. Orochio was not eligible for potential relief from deportation is because of the timing of when he committed the incident offense relative to when he entered into the country. Had that timing been different, he would have been eligible for relief and he would not have been subject to mandatory deportation. And Justice Stevens, in the Padilla case, said that if there's a situation where deportation is not absolutely mandatory and certain, it would be sufficient to tell the defendant there's a risk of deportation. And it's my position that Judge Walls did that here. At sentencing? At sentencing. At sentencing, is that a timely warning after he's already pleaded guilty? It's timely with respect to the 2255, Your Honor. He's not been sentenced by the judge, and the judge says by way of friendly admonition, you know, if you're deported, you can't come back in without permission. That would be sufficient. I think that's sufficient for purposes of telling him to file 2255. But, Your Honor, I see I'm not likely to convince you, but I would like to point out. Is that sufficient under Padilla? My position is it would be sufficient under Padilla. It could have been stronger. Maybe Judge Walls should have said, you're at risk of deportation. Does Padilla require the information to be conveyed to a defendant before the defendant enters a plea and the plea is accepted? It does. It does. The question here simply is, Your Honor, was it sufficient to put Mr. Rossio on notice that he should have moved for a 2255? Yeah, but my question was, does it satisfy the standard in Padilla? Not whether it was sufficient for a habeas. I'm not making the argument, Your Honor, that Mr. Portillo, you know, in 2004 complied with the requirements that the Supreme Court imposed in 2010. And that, of course, leads into my argument about Teague and whether Padilla applies in this case at all. And my position on that is that Padilla does not apply because it is a new rule of criminal procedure that was not dictated by precedent. Well, counsel, I mean, there's some language that I think is pretty damaging to your argument in Padilla about the weight of prevailing professional norms, as your counsel pointed out. I mean, how does that make it, if you read that, how can you argue it's a new rule? Because Teague requires a particular kind of analysis. It requires a three-part analysis that the Supreme Court didn't go into at all in Padilla. Teague was never cited and mentioned. If you look at the briefs in Padilla, Teague is not cited. And neither the respondent, the State of Kentucky, nor the United States Solicitor General's Office, which filed an amicus brief, raised the Teague issue in Padilla. Now, it's true that the professional standards that existed in 2004 recommended, urged, strongly advised criminal defense attorneys to advise their clients about deportation consequences. There's no question that that is the appropriate thing that counsel should do. The question is, was that a Sixth Amendment violation not to advise a client of deportation in 2004? And the answer to that is, it was not. Every one of the courts of appeals that addressed that issue said that counsel was not required to advise their clients about deportation. And even though the American Bar Association recommended that this be done, it was not a component of effective assistance of counsel under the Sixth Amendment. Until Padilla was decided. Right. And what – and the significant – Why did Padilla – why did Padilla – why doesn't it operate as a corrective to what lower courts have said? That's usually the posture of the Supreme Court. It is a corrective, Your Honor. The question is, under Teague, was Padilla dictated by Strickland or its precedents? Why Padilla, I think, is answered by the majority opinion by Justice Stevens. He points out that in the last 15 years, or since 1996, that immigration law had become tougher. It had become easier to deport people for a wider range of conduct. Congress had cut down on the kinds of relief that was available. And so the consequences of the kind of crime that Mr. Horacio convicted had – Mr. Gross, it strikes me that what you're saying is that Teague isn't satisfied unless and until the Supreme Court announces what's a Strickland violation. I'm not saying that, Your Honor. Surely that can't be the rule. That's not the rule. We have to wait until Padilla was decided. Nope. That's not my argument, Your Honor. That's what's required for a second or successive habeas petition under AEDPA. What's required for Teague, though, is that the decision that the defendant is trying to apply retroactively – there's no question that he's seeking retroactive application of Padilla because his prior conviction is final. He's not arguing that he qualifies under the two Teague exceptions. He has to show that this is an old rule, not a new rule. But, Mr. – I'm sorry. I wonder whether Padilla really is a new rule. I mean, Padilla focused on the Strickland standard and what constitutes deficient performance that might prejudice an individual. And then it gives, as an example, failure to tell a client that you will be deported if you plead guilty. There could be hundreds of other examples, but each time these cases come up doesn't mean that it's a new rule. You're still talking about the same standard, which is the Strickland standard. And there could be countless others that we haven't thought about. But this is an example of one, and I don't know that that means that a new rule has been enunciated. And that's what Williams v. Taylor says, right? This is my argument why it's a new rule, Your Honors. It is because what was new about Padilla, what was its innovation, was that for the first time it was the first federal court to say that a component of effective representation was the giving of deportation advice. And before that – But Justice Stevens also said that that was the legal culture back when Mr. Orochio pleaded guilty, that that was the prevailing understanding as to what counsel's obligation was. Under – And so it's hardly new. That's right, but, Your Honor, the courts had said – I mean, whether it's a new rule of constitutional law, it was the prevailing professional practice, at least as far as these practice guides go. And I should point out that one of the lawyers who didn't give adequate advice in this case was the first lawyer, federal public defender Esther Salas, who's currently a United States magistrate judge and has been nominated to sit on the district court bench. So even though the practice guides out there said that they recommended, they strongly urged district court criminal defense attorneys to advise their clients, it was not something that all competent defense attorneys did. And one of the reasons that they didn't do it is because the courts had told them it wasn't required. And I think a lot of competent criminal defense attorneys recognize, as Justice Alito points out at length in his concurrence in Padilla, that immigration law is very, very difficult and is the area that – it's an area of expertise in the law. So it was unnecessary for Mr. Porteller to have a sophisticated understanding of immigration law and therefore didn't need to advise his client properly. He was not constitutionally required to have that expertise in 2004 when he did. Mr. Gross, perhaps you can answer a question that I put to your colleague. Mr. Alcorn said he didn't know anything about why the government was prepared to and did reduce its charge to a misdemeanor from a rather serious felony and offer what Mr. Alcorn agrees is quite a sweet deal. Can you give us any advice on that? I can't answer that based on the record, Your Honor. I can talk to you about what I know off the record, but I wouldn't do that. I'm not inviting you to speak off the record. But, of course, government counsel, when the plea was agreed to, must have been aware that deportation was the next step. I wish I could say that for certainty. I'm not sure that – I don't know whether government counsel considered deportation or not. I see my time is up, but I'd just like to very briefly get back to my first point, if I could, and address Judge Fuente's question about whether this is fundamental error. We cite in our brief three non – we cite two non-presidential opinions, the Babalola case and the Evola case. And Judge Wall cites in his opinion a third case, the name of which is escaping me at the moment. But in all three of those cases, they involved situations just like this. And in one of them involved even misadvice about deportation, where the lawyer said to the defendant, you don't have to worry about deportation, just go ahead and plead guilty. That didn't happen here. And the Solicitor General conceded that that was ineffective assistance in the Padilla case. And in each one of those cases, a panel of this court assumed that there was an obligation – because the Third Circuit has never decided this, unlike virtually every other court of appeals. The Third Circuit assumed in all of those cases that counsel had acted unreasonably in not advising. And in each one of those cases, the court said the defendant was guilty of the crime that they committed. Congress has determined that that person must be deported. It's a harsh policy, but the policy is set by Congress.  And in each one of those cases, the court said this is not an appropriate case for quorum nobis. Quorum nobis is reserved for factual innocence or lack of jurisdiction, and we don't have that here. Very good. Thank you, Mr. Gorsuch. Thank you, Your Honor. Thank you as well, Mr. Alcorn. Very good arguments, very helpful.  Thank you, Your Honor.